**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO.  08-598** |
| **CEPHALON, INC.** | : | |

**GOVERNMENT'S MEMORANDUM FOR
ENTRY OF PLEA AND SENTENCING**

**I.    INTRODUCTION**

The government submits this memorandum to assist the Court with the entry of a

guilty plea and with sentencing in this case.  Defendant Cephalon, Inc., has signed a guilty plea

agreement under Fed.R.Crim.P. 11(c)(1)(C) under which, with the Court's approval, it will plead

guilty to a one-count misdemeanor information charging it with misbranding under the Food,

Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), and pay a stipulated fine of $50

million (which includes $10 million in criminal forfeiture).  The plea agreement also proposes

that the Court proceed to impose sentence immediately, waiving a presentence investigation.

The plea agreement resolves a very significant investigation into the promotional

practices in the United States of defendant Cephalon, Inc., a pharmaceutical manufacturer, for its

drugs Actiq, Gabitril, and Provigil.  The essence of the charge is that Cephalon marketed its

drugs for uses that had not been approved by the Food and Drug Administration ("FDA"), a form

of unlawful misbranding known as "off-label marketing."  This plea is part of a global resolution

that includes a civil settlement agreement with the United States and many states, a Corporate

Integrity Agreement with the Department of Health and Human Services, Office of the Inspector

1

General, and resolution of several civil actions brought under the <u>qui</u> <u>tam</u> provisions of the False

Claims Act.

## II.  THE CRIMINAL CHARGE

The information filed in this case charges Cephalon with one count of

misdemeanor misbranding under the FDCA, 21 U.S.C. §§ 331(a), 333(a)(1), and 352(f)(1).  A

copy of this information is attached as Exhibit A.

As the information explains, the FDCA intensively regulates all aspects of the

manufacture and distribution of drugs in the United States (pars. 2-3).  In general, a drug

manufacturer can not sell a drug here until the FDA approves the manufacturer's application, and

determines that the drug was safe and effective, based on well controlled clinical studies, for the

use proposed by the manufacturer.  As part of its regulatory process, the FDA also reviews and

approves the drug's "label" or "labeling," which must include adequate directions for the

intended use – that is, the use that the manufacturer proposed in seeking the FDA's approval.

Under the FDCA, a drug is misbranded if the labeling does not contain "adequate

directions for use."  21 U.S.C. § 352(f)(1).  The FDA can not approve "adequate directions for

use" until the drug is approved for that use, based on the FDA's finding that the drug is safe and

effective, as established by proper clinical studies.  Any uses for a drug that are not approved by

FDA as safe and effective, and thus that were not included in the drug's approved labeling, are

known as "off-label" indications or uses.  A drug that is promoted for an off-label indication or

use does not contain "adequate directions for use," because such an off-label indication or use

was not included in the FDA-approved labeling for the drug.  Promoting a drug for an off-label

use constitutes misbranding of that drug.

2

The information alleges that Cephalon misbranded three of its drugs by marketing them off-label from 2001 through at least 2006 (pars. 6-11).  Those drugs are the following:

- Actiq: approved by the FDA in 1998 for breakthrough cancer pain in opioid-tolerant patients.  Cephalon improperly promoted Actiq for non-cancer pain uses.

- Gabitril: approved by the FDA in 1997 as an anti-epilepsy drug, for use as adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures.  Cephalon improperly promoted Gabitril to treat anxiety, insomnia, and pain.

- Provigil: approved by the FDA in 1998 for excessive daytime sleepiness associated with narcolepsy; in 2004, the FDA approved the expansion of Provigil's label to include the treatment of excessive sleepiness associated with obstructive sleep apnea/hypopnea syndrome, and shift work sleep disorder.  Cephalon improperly promoted Provigil to treat sleepiness, tiredness, decreased activity, lack of energy and fatigue.

The information describes the defendant's off-label practices and its training of its sales staff to ignore the legal restrictions on promoting these drugs (pars. 12-18).  In particular:

- Cephalon had its sales representatives call on doctors who would not normally prescribe the defendant's drugs in the course of the doctors' practice;

- Cephalon trained its sales representatives on techniques to prompt the doctors into off-label conversations;

- Cephalon's compensation and bonus structure encouraged off-label marketing;

- Cephalon had its sales representatives tell doctors how to document their off-label uses of drugs to get these uses paid by insurers, who often will not pay for off-label uses;

- Cephalon used its grants for continuing medical education to promote off-label uses; and

- Cephalon sent doctors to "consultant" meetings at lavish resorts to hear the company's off-label message.

The information also describes the risks to patients from Cephalon's off-label marketing campaign (pars. 19-23).  Those risks were particularly high in the case of Actiq, an extremely powerful narcotic with a very narrow label, and Gabitril, an anti-seizure drug.  Actiq was approved for use by opioid-tolerant patients suffering from breakthrough cancer pain, that is, patients whose cancer pain was so severe that their opioid therapies (such as morphine) were no longer effective.  The label called for Actiq to be prescribed by oncologists or pain specialists familiar with opioids.  Yet the defendant promoted Actiq to other doctors, including general practitioners, for more general pain uses.  The use of Actiq by patients who are not yet tolerant of opioids poses particular dangers.  Similarly, the FDA found that the use of Gabitril by non-epileptics was associated with seizures.

More generally, the information describes how off-label marketing can interfere with proper patient care and thus harm patients (pars. 19, 23).   And as the information details, Cephalon proceeded with its off-label marketing campaigns despite directions from the FDA to stop (pars. 24-26).

The specific charge is that defendant Cephalon introduced and caused the introduction into interstate commerce of Provigil, Gabitril, and Actiq, drugs which were misbranded because they lacked adequate directions for their use in that Cephalon promoted them off-label, from January 2001 through October 2001 (par. 28).  This is the charge to which Cephalon is pleading guilty.

## III.    THE GUILTY PLEA AGREEMENT

The essential terms of the plea agreement are set forth here.  (A complete copy is attached for the Court's reference as Exhibit B.)  In particular:

- Cephalon agrees to plead guilty to a one-count information charging misdemeanor misbranding of its drugs Provigil, Gabitril, and Actiq between January 2001 and October 1, 2001, in violation of the FDCA, 21 U.S.C. §§ 331(a), 333(a)(1), and 352(f)(1). The charge arises from Cephalon's unlawful promotional practices, known as "off-label" marketing. Cephalon also agrees not to contest forfeiture as set forth in the agreement. Plea Agreement, par. 1.

- The parties entered into this plea agreement under Fed.R.Crim.P. 11(c)(1)(C), with a stipulated sentence. If the Court rejects this plea under Rule 11(c)(1)(C), then the plea converts automatically to a plea under Rule 11(c)(1)(B), and the stipulated sentence becomes the sentence jointly recommended by the parties. Plea Agreement, par. 2.

- The agreed-upon sentence is: payment of $50 million ($40 million as the criminal fine, plus $10 million as the criminal forfeiture), all payable within 10 business days of sentencing; plus the special assessment of $125. In light of the Corporate Integrity Agreement signed by Cephalon, the parties agree that the defendant will not be placed on probation. Plea Agreement, par. 2.

- The parties stipulate to the following facts and basis for the plea, criminal fine and forfeiture (Plea Agreement, par. 6(A)):

    (1)   Cephalon marketed Provigil, Gabitril, and Actiq, which were drugs within the meaning of 21 U.S.C. § 321(g)(1).

    (2)   Shipments of a drug in interstate commerce must be accompanied by labeling bearing adequate directions for use for each of the drug's intended uses.

    (3)   In 1998, Provigil was approved by the FDA to treat excessive daytime sleepiness associated with narcolepsy.

    (4)   Between January 2001 and October 1, 2001, Cephalon promoted Provigil for uses not approved by the FDA, including as a daytime stimulant to treat sleepiness, tiredness, decreased activity, lack of energy and fatigue. Cephalon's promotion of Provigil for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Provigil's labeling did not bear adequate directions for each of the drug's intended uses.

    (5)   In 1997, Gabitril was approved by the FDA as an anti-epilepsy drug indicated as adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures.

(6)     Between January 2001 and October 1, 2001, Cephalon promoted Gabitril for certain uses not approved by the FDA, including as an agent for anxiety, insomnia, and pain.  Cephalon's promotion of Gabitril for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Gabitril's labeling did not bear adequate directions for each of the drug's intended uses.

(7)     In 1998, Actiq was approved by the FDA for breakthrough cancer pain for patients with malignancies who were already tolerant to opioid therapy for their cancer pain.

(8)     Between January 2001 and October 1, 2001, Cephalon promoted Actiq for uses not approved by the FDA, including for non-cancer pain uses, such as injuries and migraines. Cephalon's promotion of Actiq for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Actiq's labeling did not bear adequate directions for each of the drug's intended uses.

(9)     Between 2001 through October 1, 2001, Cephalon profited by misbranding Provigil, Gabitril and Actiq, and distributing these drugs in interstate commerce.

•     The United States contends that, as a matter of relevant conduct, the conduct at issue continued past October 1, 2001.  Cephalon does not admit that this conduct extended past October 1, 2001.  Plea Agreement, par. 6(B).

•     The Plea Agreement includes a non-prosecution clause for conduct which (a) falls within the scope of the grand jury investigation in this district relating to Provigil, Gabitril, and Actiq; or (b) was known to the United States Attorney's Office for the Eastern District of Pennsylvania and the Office of Consumer Litigation of the Department of Justice as of the date of the execution of this plea agreement, and which concerned the sale, promotion, or marketing of these three drugs in the United States.  This non-prosecution clause is binding on the United States Attorney's Office for the Eastern District of Pennsylvania, the Office of Consumer Litigation of the Department of Justice, all other United States Attorney's Offices, and the Criminal Division of the United States Department of Justice.  Plea Agreement, pars. 8-9.

•     The Plea Agreement contains an appellate waiver.  There can be no appeal if the Court enters the plea under Rule 11(c)(1)(C).  If the plea is entered under Rule 11(c)(1)(B), then the defendant may appeal only to argue that the sentence exceeded the statutory maximum as set forth in the plea agreement, the Court erroneously departed upward under the Sentencing Guidelines, or the Court imposed an unreasonable sentence above the final Sentencing Guideline range.

Plea Agreement, par. 11.

- If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Fed.R.Crim.P. 32(c)(1), and ask that Cephalon be sentenced at the time the guilty plea is entered.  Plea Agreement, par. 15.

## IV.     THE OTHER COMPONENTS OF THE GLOBAL RESOLUTION

As the Plea Agreement references, this is part of a global resolution of this investigation with the United States.  In a separate civil settlement among Cephalon, the United States and various states, Cephalon will pay $375 million, plus interest, to resolve False Claims Act claims by the United States Medicaid and Medicare Trust Funds, and other federal programs and agencies, as well as claims by state Medicaid programs and the District of Columbia. This settlement also resolves the four qui tam actions filed in this district.

Along with the civil settlement agreement, Cephalon has signed a five-year Corporate Integrity Agreement with the Department of Health and Human Services, Office of the Inspector General.  This agreement imposes a strict compliance program to ensure that the conduct does not recur.

## V.     THE ESSENTIAL ELEMENTS OF THE OFFENSE

### A.     Misbranding

The information charges one count of misbranding under the FDCA, in violation of 21 U.S.C. §§ 331(a), 333(a)(1), and 352(f)(1).  Section 331 lists prohibited acts, including:

(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

Under section 352 of the FDCA, a drug is "misbranded" under several circumstances, including (as relevant here):

7

A drug or device shall be deemed to be misbranded –

(f) Directions for use and warnings on label
Unless its labeling bears (1) adequate directions for use . . . .

Section 333 sets forth penalties, including:

(a) Violation of section 331 of this title; second violation; intent to defraud or mislead
(1) Any person who violates a provision of section 331 of this title shall be imprisoned
for not more than one year or fined not more than $1,000, or both.

The information in this case charges a misdemeanor under this penalty provision.  The offense

would rise to the felony level either if the government charged and proved the defendant's intent

to defraud or mislead, or if the defendant had already been convicted of an FDCA violation (the

second-offender felony provision).  21 U.S.C. § 333(a)(2).

Thus, in order to prove the crime of misdemeanor misbranding, the government

must establish the following elements beyond a reasonable doubt:

- that Actiq, Gabitril, and Provigil are drugs

- that they were misbranded, in that they lacked adequate directions for the uses
intended by Cephalon, and

- that they were introduced into interstate commerce.

It is not illegal for a doctor to prescribe off-label, using his or her best medical judgment.

However, it constitutes misbranding for a drug manufacturer to promote an off-label use to that

doctor.

## B.    Forfeiture

The forfeiture component of the information and plea agreement arises from the

FDCA's provision for seizing misbranded drugs.  21 U.S.C. § 334 (allowing proceedings on libel

of information, for condemnation, against drugs that are misbranded or adulterated so that the

government can seize, destroy or sell them).  These proceedings are by their nature classic civil

forfeiture proceedings.  Under federal forfeiture law, the government can pursue criminal

forfeiture in any case where the defendant is charged with a violation of an Act of Congress

which contains a civil forfeiture remedy.  See 28 U.S.C. § 2461(c) (allowing criminal forfeiture

where the defendant is charged "in a criminal case with a violation of an Act of Congress for

which the civil or criminal forfeiture of property is authorized . . . .").  Thus, if civil forfeiture is

authorized in a statute such as the FDCA, then criminal forfeiture is as well.

      As the misbranded drugs are no longer available for seizure or destruction, the

government can seek substitute assets.  See 18 U.S.C. § 2461(c) (the procedures set forth in 21

U.S.C. § 853 apply to this criminal forfeiture); 21 U.S.C. § 853(p) (allowing the forfeiture of

substitute assets if the items subject to forfeiture are no longer available).

## VI.    THE MAXIMUM PENALTIES

      The maximum penalty for this offense is a fine of $200,000 (under 18 U.S.C.

§ 3571(c)(5)), or twice the gross gain or gross loss, whichever is greater (18 U.S.C. § 3571(d)); a

special assessment of $125 (18 U.S.C. § 3013(a)(1)(B)(iii)); and a five-year term of Court

supervision (18 U.S.C. § 3561(c)(2)); in addition, forfeiture may be ordered.

## VII.    THE FACTS AT TRIAL

      In the plea agreement, the parties have stipulated to a factual basis sufficient to

support the entry of this plea.  Plea Agreement, par. 6(A).  If the case were to proceed to trial, the

government would prove these facts beyond a reasonable doubt, as well as the other allegations

set forth in the information.

      In summary, the government would show a concerted plan to maximize revenue

by the off-label marketing of Actiq, Gabitril, and Provigil, which for many of the years covered by the information were Cephalon's only drugs.  The defendant's unlawful promotional efforts included several facets, set forth in the information, including training and compensating the sales staff to encourage off-label marketing, managing them to conduct this off-label marketing, co-opting the supposedly neutral continuing medical education process, and bestowing favors on doctors in the form of "consulting" sessions at lavish resorts where they attended off-label sessions.  In fact, according to a Cephalon document, these meetings "proved incredibly effective in driving prescription growth among the attendees."

At trial, the government would show that the defendant's off-label marketing was no accident.  Indeed, the proof would demonstrate that, for over six years, the very top levels of the company knew and approved of these efforts.  This was a highly organized and deliberate effort to maximize revenue despite legal restrictions.  Further, Cephalon continued its illegal promotional activities after January 2002, when the FDA specifically directed the company to stop promoting Provigil for off-label uses.

## A.   __Actiq__

The case of Actiq is particularly egregious, as this drug is 80-100 times more powerful than morphine.  The FDA-approved label for Actiq is unusually restrictive:

> [Actiq] must not be used in opioid non-tolerant patients.  Life-threatening hypoventilation could occur at any dose in patients not taking chronic opiates.  Actiq is indicated only for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain.

The label calls for Actiq to be prescribed by oncologist or pain specialists familiar with the use of opioids.  Because of the potency and risk of the drug, the FDA also mandated a risk management

program requiring Cephalon to submit quarterly reports concerning issues such as diversion.

In about 2001, Cephalon began a significantly expanded marketing effort for Actiq, including telling its sales representatives to target non-cancer physicians.  In its marketing strategy for 2002, Cephalon described the Actiq patient profile as:

> any opioid tolerant patient suffering from breakthrough pain, regardless of disease state, is a potential candidate for Actiq.  Additionally any patients suffering from moderate to severe episodic pain due to migraine headaches, sickle cell pain crises, etc. are potential candidates for Actiq.  Lastly, Actiq may also be appropriate as a pre-procedural pain medication for any opioid naive or opioid tolerant patient about to undergo radiation therapy, wound dressing changes, physical therapy, etc. in a monitored setting. . . .  By illustrating the true onset of analgesia and proving Actiq safe and effective in the treatment of other pain diagnoses, *including both opioid tolerant and opioid naive patients,* Actiq will be posed for tremendous growth in 2002 in both the BTP [breakthrough pain] and episodic pain segments of the opioid market.

(Emphasis added.)  The marketing of Actiq for patients who were "opioid naive" directly contradicted the label and increased the risk for this population considerably.

Cephalon management conveyed its disregard for the FDA-approved label for Actiq (opioid-tolerant cancer patients with breakthrough cancer pain, to be prescribed by oncologist or pain specialists familiar with opioids) to the sales force.  Using the mantra "pain is pain," Cephalon instructed the sales representatives to focus on physicians other than oncologists, and to promote Actiq for multiple uses other than breakthrough cancer pain.

## B.    Gabitril

Cephalon bought the rights to make and sell Gabitril in 2000, and started its promotions in 2001.  The drug had been approved in 1997 as an anti-epilepsy drug indicated as adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures. As of 2000, sales of Gabitril were declining.  The anti-seizure field was crowded with other anti-epileptics, and Gabitril was only indicated as adjunctive therapy, meaning it had to be taken with

11

another drug to be effective.  Cephalon knew that Gabitril was seen as "last in class as an anti-seizure medication."  Cephalon attempted to identify "new market niches" for Gabitril.

Relying on market research showing a large growth in the use of anti-convulsants by psychiatrists, in 2001 Cephalon relaunched Gabitril, calling it the first Selective Gabapentin Reuptake Inhibitor, in hopes of taking advantage of the growing market among psychiatrists for SSRIs, (Selective Serotonin Reuptake Inhibitors such as Prozac, Paxil and Zoloft which are used to treat depression and also anxiety).  To carry out its plan for Gabitril use beyond epilepsy, Cephalon instructed its sales representatives to focus on psychiatrists rather than neurologists (the specialty physicians who would ordinarily treat patients with epilepsy).

The Gabitril relaunch was successful. Cephalon tracked the rise in Gabitril prescriptions by psychiatrists from 8,065 in 2000 to 42,922 in 2001, and attributed this increase to its off-label promotion.  Management told the sales representatives that it was "VITAL to develop MORE psychiatry writers, MORE psychiatry adopters, and MORE psychiatry product champions" because the company was committed "first and foremost" to psychiatry.  This company call for the sales representatives to focus on psychiatrists, not neurologists, continued until Cephalon stopped promoting Gabitril in 2005.

In February 2005, after receiving adverse event reports that patients (mostly with psychiatric illnesses) were having seizures after taking Gabitril for conditions other than epilepsy, the FDA issued a public health advisory and required Cephalon to add a bolded warning on the Gabitril label advising physicians of the association between Gabitril and seizures in patients who did not have epilepsy.  The FDA also required Cephalon to send a letter to physicians advising of the Gabitril-seizure association.  At that point, Cephalon stopped promoting the drug.

12

C.     **Provigil**

Cephalon's shift in focus from neurologists (on-label use) to psychiatrists (off-label use) included Provigil as well as Gabitril.  Cephalon recognized that, because Provigil was the most-used drug in the limited narcolepsy population, the only avenue to greater sales was to expand the use beyond the label.  Because psychiatrists were prescribing Provigil to treat conditions such as depression-related fatigue, Cephalon revised its promotional strategy to emphasize fatigue related to conditions other than narcolepsy.  Instead of obtaining a broader indication for Provigil, however, Cephalon decided to "establish the product as a drug of choice for fatigue as well as sleepiness and to address the multiple symptoms that can be alleviated by the product in addition to the use of the product in adjunctive therapy beyond its indication" and to "better define benefits of 'wake-promotion' to expand use into other areas."

Shortly after Cephalon started promoting Provigil off-label for "wakefulness," in January 2002 the FDA directed Cephalon to stop disseminating false and misleading written promotional materials representing that Provigil was better, safer, more effective, or useful in a broader range of conditions or patients than had been approved.  The company's promotional materials had included claims that Provigil was useful for sleepiness, tiredness, decreased activity, lack of energy and fatigue.

Although Cephalon stopped using these written promotional materials, its sales force continued to promote Provigil for those unapproved uses.  For example, in November 2002, a Cephalon manager, accompanying a sales representative on calls to physicians, counseled the sales person:   "Your best call of the day was with Dr. [a psychiatrist] . . . .  Informing the physician of the transition that we have made with Provigil from narcolepsy to the variety of

areas in which it is currently being used was also effective."

In December 2002, Cephalon applied to the FDA to expand Provigil's label to cover excessive sleepiness, without regard to the patient's underlying medical condition.   In January 2004, the FDA approved a more narrow expansion of the label, not for the requested excessive sleepiness, but instead for excessive sleepiness associated with two specific medical conditions:  (1) obstructive sleep apnea, in certain patients, and (2) shift work sleep disorder. Despite these narrow expansions to the label, Cephalon continued to promote Provigil for off-label uses, behaving as if it had received the broader label it had been denied.

### D.   Sales

Cephalon's marketing and sales reports show the success of these off-label campaigns:

- Actiq: from $50.1 million in 2001 to $550.4 million in 2006

- Gabitril: from $24.6 million in 2001 to $ 87.3 million in 2004

- Provigil: from $146.2 million in 2001 to $691.7 million in 2006.

## VIII.   THE SENTENCING CONSIDERATIONS

The stipulated criminal fine of $50 million is the result of intensive negotiations between the parties.  It represents a just resolution of the charge against Cephalon for its off-label marketing, particularly when coupled with the significant civil settlement and the obligations imposed by the Corporate Integrity Agreement.  The total package is the largest resolution in this district's history.

The proposed criminal resolution accomplishes the goals of sentencing without being overly harsh.  Off-label marketing is harmful, in general, in that it interferes with the

14

doctor-patient relationship, is misleading to doctors, and can harm patients.  In this case, the harms go beyond the general.  Promoting Actiq for use in patients who were not yet opioid-tolerant risked hypoventilation and death.  Selling Gabitril for non-epileptics promoted seizures in that population.  Expanding the use of Provigil beyond its indication also potentially over-medicates patients with a drug that has not been proven to be safe and effective for those uses.

The agreed-upon sentence also properly takes into account Cephalon's conduct.  It reflects the fact that the company has no prior conviction and cooperated with the investigation, balanced against the breadth and length of the illegal conduct.  The government believes that the global resolution will deter the company from further unlawful promotions.

A fine of this nature, coupled with all of the other aspects of this case, will also be just punishment for the offense, and serve as general deterrence to others who might be tempted to go down the road of off-label marketing.  All of these factors are difficult to quantify, but the parties have engaged in lengthy discussions aimed at reaching a fair resolution of this matter.

The government therefore asks the Court to accept the plea and impose the agreed-upon sentence.

Respectfully submitted,

LAURIE MAGID
Acting United States Attorney


/s/ Catherine Votaw
CATHERINE VOTAW
Chief, Health Care Fraud
Assistant United States Attorney

15

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Memorandum was served upon

defense counsel by hand-delivery and email, on this 29th day of September, 2008, as follows:

    Eric Sitarchuk, Esquire
    Morgan Lewis
    1701 Market Street
    Philadelphia, PA 19103-2921

    /s/ Catherine Votaw
    CATHERINE VOTAW
    Chief, Health Care Fraud
    Assistant United States Attorney

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.   08 - 598** |
| **v.** | : | **DATE FILED:   9-29-2008** |
| **CEPHALON, INC.** | : | **VIOLATION:** |
| | | **21 U.S.C. § 331(a), 333(a)(1) and 352(f)(1)** |
| | : | **(Distribution of misbranded drugs:** |
| | | **inadequate directions for use - 1 count)** |
| | : | **Notice of forfeiture** |

## <u>INFORMATION</u>

## <u>COUNT ONE</u>

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

1.      Defendant CEPHALON, INC. ("CEPHALON") was a pharmaceutical corporation headquartered in West Chester, Pennsylvania.  CEPHALON's primary business activity was the development, manufacture, promotion, and sale of prescription drugs.

2.      The Federal Food, Drug and Cosmetic Act ("FDCA") governed the interstate distribution of drugs for human use.  21 U.S.C. § 301, <u>et</u> <u>seq</u>. In general, a drug manufacturer could not sell a drug in the United States until the Food and Drug Administration ("FDA") had approved the manufacturer's application, and determined that the drug was safe and effective, based on well controlled clinical studies, for the use proposed by the manufacturer.  As part of its regulatory process, the FDA also reviewed the drug's "label" or "labeling," which had to include adequate directions for the intended use – that is, the use that the manufacturer proposed in seeking the FDA's approval.

3.      The FDCA, at 21 U.S.C. § 352(f)(1), provided that a drug was misbranded if, among other things, the labeling did not contain "adequate directions for use."  As the phrase was used in the FDCA, "adequate directions for use" could not be written for medical indications or uses for which the drug had not been proven to be safe and effective, through well-controlled clinical studies.  Any uses for a drug that were not approved by FDA as safe and effective, and thus that were not included in the drug's approved labeling, were known as "off-label" indications or uses.  A drug that was promoted for an off-label indication or use did not contain "adequate directions for use," because such an off-label indication or use was not included in the FDA-approved labeling for the drug, and that drug was therefore misbranded under Section 352(f).

4.      From approximately January 2001 through at least 2006, defendant CEPHALON manufactured and sold Actiq, Gabitril, and Provigil, which were drugs within the meaning of the FDCA.  21 U.S.C. § 321(g)(1).

5.      Defendant CEPHALON sold and shipped the drugs Actiq, Gabitril, and Provigil in interstate commerce, throughout the United States, accompanied by each drug's FDA-approved labeling, which bore adequate directions for each use of that drug that the FDA had approved.

<u>Actiq</u>

6.      In 1998, the FDA approved Actiq for breakthrough cancer pain in opioid-tolerant patients.

7.      From approximately January 2001 through at least 2006, defendant CEPHALON improperly promoted Actiq for non-cancer pain uses, such as injuries and

2

migraines.  These additional intended uses were not approved by the FDA.  In promoting Actiq

for these new intended uses, CEPHALON caused the drug to be misbranded under 21 U.S.C.

§ 352(f)(1).

Gabitril

8.      In 1997, the FDA approved Gabitril as an anti-epilepsy drug indicated as

adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures.

9.      From approximately January 2001 through February 2005, defendant

CEPHALON improperly promoted Gabitril to treat anxiety, insomnia, and pain.  These

additional intended uses were not approved by the FDA.  In promoting Gabitril for these new

intended uses, CEPHALON caused the drug to be misbranded under 21 U.S.C. § 352(f)(1).

Provigil

10.      In 1998, the FDA approved Provigil to treat excessive daytime sleepiness

associated with narcolepsy.  In 2004, the FDA approved the expansion of Provigil's label to

include the treatment of excessive sleepiness associated with obstructive sleep apnea/hypopnea

syndrome, and shift work sleep disorder.

11.      From approximately January 2001 through at least 2006, defendant

CEPHALON improperly promoted Provigil as a non-stimulant drug for the treatment of

sleepiness, tiredness, decreased activity, lack of energy and fatigue.  These additional intended

uses were not approved by the FDA.  In promoting Provigil for these new intended uses,

CEPHALON caused the drug to be misbranded under 21 U.S.C. § 352(f)(1).

<u>Cephalon's Off-label Promotional And Sales Practices</u>

12.     Defendant CEPHALON's management trained the sales force to disregard the restrictions of the FDA-approved label, and to promote CEPHALON's drugs for off-label uses.

13.     Defendant CEPHALON's management directed its sales force to visit doctors who, due to the nature of their practices, normally would not prescribe CEPHALON's drugs to convince the doctors to prescribe the drugs for off-label uses.  For example, the Actiq label stated that the drug was for "opioid tolerant cancer patients with breakthrough cancer pain, to be prescribed by oncologist or pain specialists familiar with opioids."  Using the mantra "pain is pain," CEPHALON instructed the Actiq sales representatives to focus on physicians other than oncologists, including general practitioners, and to promote this drug for many uses other than breakthrough cancer pain.  In the case of Gabitril, which had been approved for the treatment of partial seizures in epilepsy, CEPHALON told the sales force to visit not just neurologists (the specialty that normally treated epilepsy), but also psychiatrists, and to promote the drug for anxiety and other psychiatric indications.

14.     Defendant CEPHALON trained its sales representatives on particular questioning techniques to use with their customer physicians to prompt off-label conversations about the company's drugs.

15.     Defendant CEPHALON compensated its sales representatives through sales quotas and a bonus structure designed to encourage off-label promotion of its drugs.  In effect, sales representatives generally could only reach their sales goals by promoting and selling off-label.

4

16.     Because insurers, and third-party payors such as Medicaid, often do not reimburse for drugs when prescribed for off-label purposes, defendant CEPHALON instructed the sales representatives to coach the physicians on what diagnostic codes to record in their documentation.  For example, CEPHALON instructed its sales representatives to advise doctors to use the diagnostic code for idiopathic hypersomnia when using Provigil to treat fatigue, an off-label indication, because Provigil would not be reimbursable if prescribed for fatigue.

17.     Defendant CEPHALON employed sales representatives and retained medical professionals to speak to doctors about off-label uses of Actiq, Gabitril, and Provigil. The company funded continuing medical education programs, through millions of dollars in grants, to promote off-label uses of its drugs, in violation of the FDA's requirements.  From 2001 to 2004, CEPHALON provided over $80 million for such grants.

18.     As a way to increase off-label prescribing, defendant CEPHALON regularly sent doctors to lavish resorts for supposed "consultant" meetings to hear discussions about off-label uses of its drugs.  The sales representatives invited those doctors believed to have the greatest potential for increasing their writing of CEPHALON prescriptions for off-label uses.

<u>Risks to Patients</u>

19.     These off-label promotions, directed by defendant CEPHALON, caused patient harm, raised safety issues, and affected the proper treatment of patients.  CEPHALON undertook these promotions for its own gain, despite the risk to patients' health and lives.

20.     Actiq was an extremely powerful narcotic drug with a very narrow label. The FDA approved this drug for patients suffering breakthrough cancer pain, who had already developed a tolerance for opioid products (such as morphine); that is, the drug's label stated that

5

Actiq was approved for patients who suffered from such severe, persistent cancer pain that their opioid therapy was not effective.  The approved label also required that the drug be prescribed by an oncologist or a pain specialist familiar with opioids.  Actiq was a fentanyl product manufactured as a lollipop for the immediate delivery of pain relief.  Because it was a strong and highly addictive narcotic, with significant potential for abuse, the FDA required defendant CEPHALON to submit quarterly reports about the company's efforts to manage the risks of the drug.

21.     The use of Actiq could cause addiction, hypoventilation, or death, particularly in patients who were not already opioid-tolerant.  Despite the restrictions in Actiq's label, and the known risks to patients, defendant CEPHALON promoted the drug for many types of pain, including migraines and sickle-cell pain crises, and in anticipation of changing wound dressings or radiation therapy.  CEPHALON also promoted Actiq for use in patients who were not yet opioid tolerant.

22.     The off-label use of Gabitril – approved for the treatment of epilepsy, but which defendant CEPHALON promoted for psychiatric uses – in fact caused seizures in certain patients who did not have epilepsy.

23.     More generally, the promotion of an off-label use for a prescription drug can interfere with the proper treatment of a patient.  Off-label promotion can lull a physician into believing that the drug being promoted is safe and effective for the intended off-label use, and that the FDA has approved the drug for that use.  Thus, off-label promotion can cause a doctor and patient to forgo treatment with an FDA-approved drug that has been proven to be safe and

effective, and instead to substitute a treatment urged by the sales representative that is not known to be safe and effective, and that may in fact be harmful.

## FDA's Warnings To Cephalon

24.     In January 2002, shortly after defendant CEPHALON embarked on its off-label campaign promoting Provigil for wakefulness, the FDA sent CEPHALON a letter requiring the company to cease disseminating false and misleading written promotional materials representing that Provigil was better, safer, more effective, or useful in a broader range of conditions or patients than the FDA had approved.  CEPHALON's written promotional materials included assertions that Provigil was useful for sleepiness, tiredness, decreased activity, lack of energy, and fatigue.

25.     In February 2007, the FDA sent defendant CEPHALON a warning letter informing the company that a promotional piece that it distributed was

> false or misleading because it states or suggests that Provigil is safe and effective for use in the treatment of various disorders associated with fatigue, sleepiness, or inattentiveness, when in fact, Provigil is not indicated for fatigue at all and is indicated only for specific groups of patients with excessive sleepiness [as identified in the letter].

The FDA directed CEPHALON to cease immediately the dissemination of promotional materials for Provigil such as the material described in the FDA's letter.

26.     In February 2005, once the FDA learned about seizures in some patients who had been prescribed Gabitril for conditions other than epilepsy, the agency issued a public health advisory.  The FDA also required defendant CEPHALON to add a bolded warning on the Gabitril label advising doctors of the association between Gabitril and seizures in non-epileptic

patients, and to send a letter to doctors advising them of the Gabitril-seizure association.

CEPHALON then stopped promoting this drug.

<u>Profit to Cephalon</u>

27.     From approximately January 2001 through at least 2006, defendant

CEPHALON profited financially by misbranding Actiq, Gabitril, and Provigil through off-label

promotion, and distributing these drugs in interstate commerce.

28.     From in or about January 2001 through in or about October 2001, in the

Eastern District of Pennsylvania and elsewhere, defendant

**CEPHALON, INC.**

introduced into interstate commerce, and caused the introduction into interstate commerce, of

quantities of Provigil, Gabitril, and Actiq, drugs within the meaning of the Federal Food, Drug

and Cosmetic Act, 21 U.S.C. § 321(p), which were misbranded under 21 U.S.C. § 352(f)(1), in

that these drugs lacked adequate directions for their use, because CEPHALON promoted the

drugs for uses that were outside of the drugs' labels, and that had not been approved by the Food

and Drug Administration.

In violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and

352(f)(1).

## NOTICE OF FORFEITURE

**THE UNITED STATES FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1) set forth in this information, defendant

**CEPHALON, INC.**

shall forfeit to the United States of America any quantities of Actiq, Gabitril, and Provigil, which between January 2001 and October 1, 2001 were misbranded when introduced into or while in interstate commerce, or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of  Title 21, United States Code, Section 331, be introduced into interstate commerce.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $10,000,000.

All pursuant to Title 21, United States Code, Sections 334 and 853, and Title 28, United States Code, Section 2461(c).

/s/ Laurie Magid
**LAURIE MAGID**
**ACTING UNITED STATES ATTORNEY**

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

    v.        :   **CRIMINAL NO.**

CEPHALON, INC.       :

## GUILTY PLEA AGREEMENT

    Under Federal Rule of Criminal Procedure 11(c)(1)(C), the government, the

defendant, Cephalon, Inc. (hereinafter "Cephalon"), and Cephalon's counsel enter into the

following guilty plea agreement. Any reference to the United States or the government in this

agreement shall mean the Office of the United States Attorney for the Eastern District of

Pennsylvania, and the Office of Consumer Litigation of the Department of Justice.

    1.  Cephalon agrees to plead guilty to Count One of an Information, waiving

prosecution by indictment, charging it with the introduction into interstate commerce of drugs

that were misbranded through off-label promotion, a misdemeanor, in violation of 21 U.S.C.

§§ 331(a), 333(a)(1) and 352(f)(1), and not to contest forfeiture as set forth in the notice of

forfeiture seeking criminal forfeiture of $10,000,000 in substitute assets, in lieu of the drugs

which were promoted off-label and are no longer available, all arising from Cephalon's off-label

promotion of its drugs Provigil, Gabitril, and Actiq between January 2001 and October 1, 2001.

Cephalon further acknowledges its waiver of rights, as set forth in the attachment to this

agreement.

    2.  The parties agree that this plea agreement is made pursuant to

Fed.R.Crim.P. 11(c)(1)(C) and that the following specific sentence is the appropriate disposition

of this case. If the Court rejects this plea agreement, the parties further agree that this agreement shall automatically convert to a plea agreement pursuant to Fed.R.Crim.P. 11(c)(1)(B), and this specific sentence shall be the joint recommendation of the parties, although not binding on the Court. The agreed upon sentence is as follows:

          A.      Cephalon agrees to pay the special assessment in the amount of $125 on the date of sentencing.

          B.      Cephalon agrees to pay $50,000,000 to resolve this Information, of which $40,000,000 will be applied to a criminal fine, and $10,000,000 will be applied as substitute assets to satisfy the forfeiture obligation. Cephalon will pay these amounts within 10 business days of the date of sentencing. Cephalon and the government agree that this fine and forfeiture represent a fair and just resolution of all issues associated with loss, fine and forfeiture calculations.

          C.      Cephalon agrees that as a result of its acts or omissions, the forfeitable property, that is the drugs which were promoted off-label, are no longer available for forfeiture as they cannot be located or have been transferred, sold or deposited with a third party, or otherwise disposed of, within the meaning of federal law. As a result, Cephalon agrees to the entry and satisfaction of a judgment and preliminary order of forfeiture on the date of the guilty plea, forfeiting to the United States the sum of $10,000,000 as substitute assets for the pertinent drugs. Cephalon agrees that, within 10 business days of the date of sentencing, Cephalon will make payment to the United States, by means of a wire transfer to the United States Marshal Service or check payable to same, in the amount of $10,000,000, this amount representing

2

substitute assets of the offense for which it is pleading guilty, subject to forfeiture in full satisfaction of the judgment and preliminary order of forfeiture.

        D.     The government agrees that, in light of the Corporate Integrity Agreement executed contemporaneously with this guilty plea agreement, Cephalon will not be placed on probation.

        3.     In a separate civil settlement among Cephalon, the United States and various States, executed contemporaneously with this guilty plea agreement, Cephalon will pay $375,000,000. Cephalon waives any and all defenses and objections in this matter or in that civil proceeding which might be available under the Double Jeopardy and Excessive Fines clauses of the Eighth Amendment. The parties agree that, in light of this civil settlement, and to avoid complicating and prolonging the sentencing process, the appropriate disposition of this case does not include a restitution order.

        4.     Cephalon waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

        5.     Cephalon understands, agrees and has had explained to it by counsel that the Court may impose the following statutory maximum sentence: a fine of $200,000, or twice the gross gain or gross loss, whichever is greater; a special assessment of $125; restitution as ordered by the Court; and a five-year term of Court supervision; in addition, forfeiture may be ordered. Cephalon further understands that the terms and conditions of any Court supervision may be changed, and extended, by the Court if Cephalon violates any of the terms and conditions of that supervision.

6.    With respect to Cephalon's conduct:

A.    The parties stipulate to the following facts and basis for the plea, criminal fine and forfeiture:

(1)    Cephalon marketed Provigil, Gabitril, and Actiq, which were drugs within the meaning of 21 U.S.C. § 321(g)(1).

(2)    Shipments of a drug in interstate commerce must be accompanied by labeling bearing adequate directions for use for each of the drug's intended uses.

(3)    In 1998, Provigil was approved by the FDA to treat excessive daytime sleepiness associated with narcolepsy.

(4)    Between January 2001 and October 1, 2001, Cephalon promoted Provigil for uses not approved by the FDA, including as a daytime stimulant to treat sleepiness, tiredness, decreased activity, lack of energy and fatigue.  Cephalon's promotion of Provigil for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Provigil's labeling did not bear adequate directions for each of the drug's intended uses.

(5)    In 1997, Gabitril was approved by the FDA as an anti-epilepsy drug indicated as adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures.

(6)    Between January 2001 and October 1, 2001, Cephalon promoted Gabitril for certain uses not approved by the FDA, including as an

4

agent for anxiety, insomnia, and pain. Cephalon's promotion of Gabitril for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Gabitril's labeling did not bear adequate directions for each of the drug's intended uses.

(7)     In 1998, Actiq was approved by the FDA for breakthrough cancer pain for patients with malignancies who were already tolerant to opioid therapy for their cancer pain.

(8)     Between January 2001 and October 1, 2001, Cephalon promoted Actiq for uses not approved by the FDA, including for non-cancer pain uses, such as injuries and migraines. Cephalon's promotion of Actiq for these additional intended uses violated 21 U.S.C. § 352(f)(1), because Actiq's labeling did not bear adequate directions for each of the drug's intended uses.

(9)     Between 2001 through October 1, 2001, Cephalon profited by misbranding Provigil, Gabitril and Actiq, and distributing these drugs in interstate commerce.

B.     The United States contends that, as a matter of relevant conduct, the conduct which forms the basis for this plea agreement, as set forth in subsection (A) above, continued past October 1, 2001. Cephalon does not admit that this conduct extended past October 1, 2001.

7.     Cephalon and the United States retain the right to withdraw from this guilty plea agreement, and this plea agreement will be null and void, if the civil settlement

5

agreement and Corporate Integrity Agreement are not executed contemporaneously with this plea agreement.

8.      The government agrees that, other than the charges in the Information in this case, it will not bring any other criminal charges against Cephalon for conduct which (a) falls within the scope of the grand jury investigation in the Eastern District of Pennsylvania relating to Cephalon's drugs Provigil, Gabitril, and Actiq; or (b) was known to the United States Attorney's Office for the Eastern District of Pennsylvania and the Office of Consumer Litigation of the Department of Justice as of the date of the execution of this plea agreement, and which concerned the sale, promotion, or marketing of these three drugs in the United States.   The non-prosecution provisions of this paragraph are binding on the Office of the United States Attorney for the Eastern District of Pennsylvania, the Office of Consumer Litigation of the Department of Justice, the United States Attorney's Offices for each of the other 93 judicial districts of the United States, and the Criminal Division of the United States Department of Justice.   Attached as Exhibit B is a copy of the letter to United States Attorney Laurie Magid from the Assistant Attorney General, Criminal Division, Department of Justice, authorizing this agreement.

9.      Cephalon understands that this guilty plea agreement does not bind any other government agency, or any component of the Department of Justice except as specified in paragraph 8 of this guilty plea agreement.   Further, Cephalon understands that the United States takes no position as to the proper tax treatment of any of the payments made by Cephalon pursuant to this plea agreement, the civil settlement agreement, or the Corporate Integrity Agreement referenced in this plea agreement.

6

10.     Cephalon agrees to waive the statute of limitations, and any other time-related defense, to the charge to which it is agreeing to plead guilty under this plea agreement. Cephalon understands and agrees that, should it seek to withdraw its plea, it may then be prosecuted for any criminal violation of which the United States has knowledge arising out of this investigation, subject to any applicable statute of limitation or other time-related protection not waived in this paragraph. Cephalon agrees that if it does not enter its plea, or withdraws its plea, after signing this agreement, the time period between the signing of this agreement and its withdrawal shall be excluded from calculation of the limitations or time period.

11.     In exchange for the undertakings made by the government in entering this plea agreement, Cephalon voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law. This waiver is not intended to bar the assertion of constitutional claims that the relevant case law holds cannot be waived.

If this plea agreement converts to a plea agreement pursuant to Fed.R.Crim.P. 11(c)(1)(B):

A.     Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of its sentence.

B.     If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal but may raise only claims that:

7

      (1)     the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in this plea agreement;

      (2)     the sentencing judge erroneously departed upward pursuant to the Sentencing Guidelines; and/or

      (3)     the sentencing judge, exercising the Court's discretion pursuant to United States v. Booker, 543 U.S. 220 (2005), imposed an unreasonable sentence above the final Sentencing Guideline range determined by the Court.

If the defendant does appeal pursuant to this paragraph, no issue may be presented by the defendant on appeal other than those described in this paragraph.

      12.     Cephalon also waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

      13.     Cephalon is satisfied with the legal representation provided by its lawyers; Cephalon and its lawyers have fully discussed this guilty plea agreement; and Cephalon is agreeing to plead guilty because Cephalon admits that it is guilty.

      14.     Cephalon will acknowledge acceptance of this guilty plea agreement by the signature of its counsel and of a responsible corporate officer. Cephalon shall provide to the government for attachment to this plea agreement a notarized resolution by Cephalon's Board of

8

Directors authorizing the corporation to enter a plea of guilty, and authorizing that responsible corporate officer to execute this agreement.

      15.    If acceptable to the Court, the parties agree to waive the presentence investigation and report pursuant to Rule 32(c)(1) of the Federal Rules of Criminal Procedure, and ask that Cephalon be sentenced at the time the guilty plea is entered.

      16.    It is agreed that the parties' guilty plea agreement contains no additional promises, agreements or understandings other than those set forth in this written guilty plea agreement, and that no additional promises, agreements or understandings will be entered into unless in writing and signed by all parties.

## SIGNATURES FOR THE UNITED STATES

GREGORY G. KATSAS
Assistant Attorney General
Civil Division
United States Department of Justice


EUGENE THIROLF
Director, Office of Consumer Litigation
United States Department of Justice


LAURIE MAGID
Acting United States Attorney


JEFFREY STEGER
Trial Attorney
Office of Consumer Litigation
United States Department of Justice


CATHERINE VOTAW
Chief, Health Care Fraud
Assistant United States Attorney

DATED:    Sept. 26, 2008

## SIGNATURE FOR CEPHALON

DATE: 9/15/08

GERALD J. PAPPERT
Executive Vice President and General
Counsel
Cephalon, Inc.

## SIGNATURES OF CEPHALON'S ATTORNEYS

DATE: 9/10/08

ERIC W. SITARCHUK, Esquire
Morgan, Lewis & Bockius LLP
Counsel for Defendant

J. SEDWICK SOLLERS III, Esquire
MARK A. JENSEN, Esquire
King & Spalding, LLP
Counsel for Defendant

Attachment

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

      v.                     :          CRIMINAL NO.

CEPHALON, INC.               :

## ACKNOWLEDGMENT OF RIGHTS

Cephalon, Inc. ("Cephalon"), through its properly authorized officer, hereby acknowledges that it has certain rights that it will be giving up by pleading guilty.

1.     Cephalon understands that it does not have to plead guilty.

2.     Cephalon may plead not guilty and insist upon a trial.

3.     At that trial, Cephalon understands:

     a.     that Cephalon would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with its attorney, Cephalon would have the right to participate in the selection of that jury;

     b.     that the jury could only convict Cephalon if all twelve jurors agreed that they were convinced of Cephalon's guilt beyond a reasonable doubt;

     c.     that the government would have the burden of proving Cephalon's guilt beyond a reasonable doubt and that Cephalon would not have to prove anything;

     d.     that Cephalon would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that Cephalon was guilty;

     e.     that Cephalon would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if Cephalon could not afford to hire a lawyer, the court would appoint one for Cephalon free of charge;

2

f.     that through Cephalon's lawyer Cephalon would have the right to confront and cross-examine the witnesses against Cephalon;

g.     that Cephalon could call witnesses to testify in its defense if Cephalon wanted to, and Cephalon could subpoena witnesses for this purpose if Cephalon wanted to; and

h.     that Cephalon would not have to call witnesses to testify or otherwise present any defense if Cephalon did not want to, and that if Cephalon did not present any evidence, the jury could not hold that against Cephalon.

4.     Cephalon understands that if Cephalon pleaded guilty, there will be no trial and Cephalon would be giving up all of the rights listed above, as well as any other rights associated with the trial process arising under statute, common-law, or judicial precedent.

5.     Cephalon understands that if Cephalon decides to enter a plea of guilty, the judge will ask Cephalon representatives questions under oath, and that if any of those representatives lie on behalf of Cephalon in answering those questions, those persons could be prosecuted for the crime of perjury, that is, for lying under oath.

6.     Cephalon understands that if Cephalon pleads guilty, Cephalon has waived its right to appeal, except as set forth in appellate waiver provisions of the plea agreement.

7.     Understanding that Cephalon has all these rights and that by pleading guilty Cephalon is giving them up, Cephalon still wishes to plead guilty.


_9/15/08_

GERALD J. PAPPERT
Exec. Vice President and General Counsel
for Cephalon, Inc., the Defendant


ERIC SITARCHUK, Esquire
Morgan, Lewis & Bockius LLP
Counsel for Defendant.


3



**U.S. Department of Justice**

Criminal Division

---

*Assistant Attorney General*                    *Washington, D.C. 20530*

**AUG 2 8 2008**

The Honorable Laurie Magid
United States Attorney
Eastern District of Pennsylvania
Philadelphia, Pennsylvania 19106

Attention:    Catherine Votaw
               Assistant United States Attorney

Re:    <u>Global Non-prosecution Agreement for Cephalon, Inc.</u>

Dear Ms. Magid:

This is in response to your request for authorization to enter into a global case disposition agreement with the company Cephalon, Inc.

I hereby approve the terms of the Plea Agreement, including Paragraph 8, in which the United States Attorney's Offices and the Criminal Division of the Department of Justice agree not to initiate further criminal prosecutions as set out therein.

You are authorized to make this approval a matter of record in this proceeding.

Sincerely,

Matthew W. Friedrich
Acting Assistant Attorney General

John C. Keeney
Deputy Assistant Attorney General
Criminal Division

## EXHIBIT B